THOMAS FOODS, INC., APPELLEE, *v.* THE PENNSYLVANIA
RAILROAD COMPANY, APPELLANT.*

*Motion to certify the record overruled, July 6, 1960.

(No. 8606—Decided March 28, 1960.)

*Mr. Alton E. Purcell,* for appellee.

*Messrs. Taft, Stettinius & Hollister* and *Mr. John W. Hudson,* for appellant.

O'CONNELL, J.   On April 14, 1954, California Frozen Foods, Inc., shipped from California to the plaintiff, appellee herein, car No. PFE 200670, partially loaded with frozen spinach. The car was routed through Arlington, Washington, to complete loading with frozen peas.   The car then moved to Norwood, Ohio, where it was delivered to the plaintiff, which claimed that some of the frozen food was thawed.   The plaintiff then filed a claim with the carrier, which claim was rejected.   Thereupon, it filed this action, in which it claimed damages.

The case was tried in the lower court without a jury, and many of the facts were stipulated by the parties.   These stipulations are as follows:

"1. Plaintiff is a corporation organized and existing under the laws of the state of Ohio.   Defendant is a corporation organized and existing under the laws of the state of Pennsylvania and is engaged in business as a common carrier of goods and passengers by rail and owns and operates a system of rails part of which traverse the state of Ohio.

"2. On or about the first part of April, 1954, plaintiff purchased from California Frozen Foods, Inc., at Modesto, California, 1379 cases of leaf spinach and from Twin City Foods, Inc., at Arlington, Washington, 1134 cases of peas.   Attached hereto and made part hereof are copies of certificates of quality and condition for processed fruits and vegetables of the United States Department of Agriculture with reference to a portion of said spinach.   Attached to plaintiff's deposition of James Peterson and Harold Lien, and marked as exhibit 2 thereof, is a copy of certificate of quality and condition for processed fruits and vegetables of the United States Department of Agriculture with reference to said peas.

"3. California Frozen Foods, Inc., ordered from Southern Pacific Company a refrigerator car for the purpose of shipping to plaintiff the 1379 cases of frozen leaf spinach. The car, numbered PFE 200670, was placed for loading on April 13, 1954, at 6 p. m., and the loading was begun about 11 a. m. and completed about 3 p. m. on April 14, 1954 by the shipper, California Frozen Foods, Inc.

"4. The records of the Southern Pacific Co. show: That said car was inspected by its inspector on April 6, 1954, at Roseville, California; that he reported no defects in said car; that the car was not used before it was placed at California Frozen Foods, Inc., place of business for loading on April 13, 1954; and that no repairs of any kind were made on it in transit from Modesto, California, to Norwood, Ohio.

"5. The 1379 cases of frozen spinach were loaded in the refrigerator car by the employees of California Frozen Foods, Inc., from end to end and from side to side of the car and covered the entire floor of the car.

"6. After the spinach was loaded the car was picked up about 5 p. m. on April 14, 1954, by the Southern Pacific Company at the place of loading and was consigned to plaintiff at Norwood, Ohio, first stop to complete loading at Glacier Cold Storage Company at Arlington, Washington. It arrived at Auburn, Washington, at 5:35 a. m., Sunday, April 18, 1954, and left Auburn for Arlington, Washington, at 6:35 a. m., Monday, April 19, 1954, where it arrived and was placed at the warehouse of Glacier Cold Storage, Inc., for completion of loading on April 19, 1954, at 11:45 a. m. according to the records of the Glacier Cold Storage Company.

"7. After the car was placed at its warehouse, the Glacier Cold Storage Company loaded into the car 1134 cases of peas which had been placed in its warehouse by Twin City Foods, Inc. The car left Arlington at 8:10 p. m. the same day and arrived at Auburn, Washington, at 12:50 a. m., April 20, 1954. It arrived at Norwood, Ohio, on April 27, 1954, and was placed for unloading at 10 a. m. on that day.

"8. The shipments loaded in the car were covered by a uniform straight bill of lading, a correct copy of which is attached hereto and made part hereof. The bill of lading provided for 'Standard Refrigeration' which term is defined in Perishable Protective Tariff No. 16, Local Joint and Propor-

tional Charges and Rules and Regulations covering the handling of perishable freight at, from and to points in the United States under which tariff this shipment moved. This tariff was properly filed and in effect at the time the shipment moved.

"9. Rules numbered 80, 130 and 135 of said tariff are as follows:

" '*Rule No. 80*

" '(A) On carload shipments, shippers must declare in writing on shipping order and/or bill of lading, at loading station, the protective service desired as authorized by this tariff.

" '(B) Upon receipt of shipping order and/or bill of lading agents must enter on regular weigh bill the full name of the shipper and notation for protective service in accordance with the class of protective service selected by shipper as authorized by this tariff.

" '(C) Blanket instructions relating to protective service will not be accepted. Instructions as authorized in the rule governing the service selected must be filed covering each individual shipment.'

" '*Rule No. 130*

" 'Carriers furnishing protective service as provided herein do not undertake to overcome the inherent tendency of perishable goods to deteriorate or decay, but merely to retard such deterioration or decay insofar as may be accomplished by reasonable protective service, of the kind and extent requested by the shipper, performed without negligence.'

" '*Rule No. 135*

" 'Property accepted for shipment under the terms and conditions of this tariff will be received and transported subject to such directions, only, and to such election by the shipper respecting the character and incidents of the protective service as are provided for herein. The duty of the carriers is to furnish without negligence reasonable protective service of the kind and extent so directed or elected by the shipper, and carriers are not liable for any loss or damage that may occur because the directions of the shipper were incomplete, inadequate or ill-conceived.'

"10. 'Standard Refrigeration,' as defined in item 25920 of said tariff and as referred to in said bill of lading, means protective service against heat by use of ice placed in the tanks or

bunkers of refrigerator cars. Rule 201 of said tariff provides that the shipper must declare in writing on the shipping order and/or bill of lading at loading station the service desired as authorized by this rule using one of the shipping instructions set forth in the rule. One of these instructions is 'Standard Refrigeration Service with Salt.' The rule then provides that the shipper must indicate the amount of salt under the provisions of rule 203 of said tariff. The shipper, in compliance with these rules, placed the following instructions on the bill of lading: 'Standard Refrigeration—coarse ice—39% salt.' Rule 203 then provides that the freight agent for the carrier must enter on the waybill covering the shipment the following instruction: 'Re-ice the capacity at all regular icing stations with coarse ice and 30% salt.' This notation was placed on the waybill covering the shipment in question in this action.

"11. The records of the raidroad companies show: (1) That the following are all of the regular 'icing stations,' as defined by the tariff, between the origin and destination of said shipment over the route provided for in the bill of lading: (2) That ice and salt were supplied at these icing stations as listed below, to wit:

| "Station | Date | Hour | Ice Supplied lbs. | Salt Furnished lbs. |
|---|---|---|---|---|
| Modesto, Cal. | 4/12 | 11 a.m. | 14,100 | 4,230 |
| Modesto, Cal. | 4/12 | 3 p.m. | 2,700 | 810 |
| Modesto, Cal. | 4/14 | 7 p.m. | 3,600 | 1,080 |
| Roseville, Cal. | 4/16 | 4 a.m. | 2,800 | 840 |
| Klamath Falls, Ore. | 4/16 | 9 p.m. | 1,600 | 480 |
| Brooklyn, Ore. | 4/17 | 3 p.m. | 1,400 | 420 |
| Auburn, Wash. | 4/18 | 5:35 a.m. | 2,560 | 768 |
| Auburn, Wash. | 4/20 | 3 p.m. | 3,620 | 1,086 |
| Spokane, Wash. | 4/21 | 2:05 p.m. | 2,436 | 731 |
| Laurel, Mont. | 4/22 | 10:15 p.m. | 2,520 | 756 |
| Dilworth, Minn. | 4/23 | 11:45 p.m. | 5,130 | 1,539 |
| Dayton Bluffs, Minn. | 4/25 | 5:20 a.m. | 2,100 | 630 |
| Blue Island, Ill. | 4/26 | 2:30 a.m. | 1,000 | 300 |
| Cincinnati, Ohio | 4/27 | 6:15 p.m. | 4,500 | 1,350 |

(3) that the amount of ice and salt listed above filled the car to capacity at each icing, and (4) that vents were closed and plugs in on arrival at each icing station.

"12. On April 28, 1954, the car and its contents were inspected by the Railroad Perishable Inspection Agency, and a correct copy of the report of this inspection is attached hereto and made a part hereof.

"13. Plaintiff paid all freight charges due on the car and filed a claim with the defendant within the statutory period. The claim was rejected by defendant, and this suit was filed within the statutory period after such rejection. If plaintiff is entitled to recover judgment from defendant, which defendant denies, the amount thereof should be $4,742.83 plus interest from April 27, 1954, and costs.

"14. The temperature at Modesto, California, on April 14, 1954, was: Maximum—81°, minimum—53°. The temperature at Arlington, Washington, on April 19, 1954, was: Maximum—55°, minimum—37°. The temperature at Auburn, Washington, on April 18, 1954, was: Maximum—59°, minimum—43°."

The trial court gave judgment to the plaintiff in the sum of $4,742.83. It is from that judgment that the defendant has perfected this appeal.

Now it is well known that at common law, and incidentally under the Louisiana Civil Code, the carrier was liable as an insurer (that is, "one who insures or makes certain"; one who guarantees—Webster's New International Dictionary, Unabridged, 1959) of freight against all losses excepting those arising from an act of God, an act of the public enemy, the inherent nature of the foods, the conduct of the shipper, or from the act or mandate of public authority. However, even in these cases "the carrier may be liable by reason of negligence." *Robinson* v. *Bush, Recr.*, 199 Mo. App., 184, 200 S. W., 757. Moreover, the carrier could "by special contract, restrict his liability, so far as he is an insurer against losses by mistake or accident." *Davidson* v. *Graham*, 2 Ohio St., 131.

But Congress has always possessed the power to legislate on the subject of interstate commerce and it exercised this power by passing several amendments to the Interstate Commerce Act, "the first of which is known as the Carmak Amendment and [it] was enacted for the purpose of making the obligation

and liability of an interstate carrier of goods, and its contracts relative thereto, subject to uniform rules instead of [to] diverse rules laid down by the courts and legislatures of the different states." (15 Corpus Juris Secundum, 437, Section 92.) This amendment and other federal legislation superseded and displaced all state laws with reference to the common carrier's liability for loss on interstate shipments and with reference to any limitation on the carrier's liability on the contract. Thus, the rights and liabilities of the parties with reference to loss or damage to the shipment "including the validity of a stipulation in the contract of carriage relating to liability, depend on, and are controlled entirely by, acts of Congress, decisions of federal courts construing them, the receipt, bill of lading, or other shipping contract, and common-law principles as accepted and tried in the federal tribunals * * *." (15 Corpus Juris Secundum, 438, Section 92.) And thus, "by the Carmak Amendment to the Interstate Commerce Act * * * Congress has relieved carriers of interstate shipments from the liability of insurers." *Atlantic Coast Line Rd. Co.* v. *Sandlin*, 75 Fla., 539, 78 So., 667, paragraph seven of the syllabus.

Moreover, "the rules, regulations, and rates filed by the carriers with the Interstate Commerce Commission enter into and form part of all contracts of shipment, whether shipper has notice of them or not." (Paragraph four of the syllabus, *Hartness* v. *Iberia & V. R. Co.*, 297 F., 622.)

The entire subject of Interstate Commerce is treated in Title 49, U. S. Code, under the heading of Transportation. The liability of the initial carrier and the delivering carrier for loss or damage is set forth in paragraph 11 of Section 20 of this title. This paragraph provides for the issuance of a bill of lading. It further provides that the initial carrier shall be liable for the "full actual loss, damage, or injury to such property [received by the carrier] caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading." This is the liability imposed regardless of any effort made in the bill of lading or otherwise to limit such liabil-

ity. And its further provisions make liable in interstate shipments within the United States or within an adjacent foreign country "to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon * * * for the full actual loss, damage, or injury to such property" any connecting carrier including the carrier "delivering said property so received and transported." And so it was held in *Chicago & Northwestern Ry. Co.* v. *C. C. Whitnack Produce Co.*, 258 U. S., 369, 66 L. Ed., 665, 42 S. Ct., 328, that "there is a common-law presumption, applicable under the Carmak Amendment, against the delivering carrier, that the injury occurred on the delivering carrier's line." Incidentally, the carrier against whom the lawful holder of the bill of lading has chosen to file a claim or suit and which has either paid the claim or the judgment may in turn recover from the carrier at fault by virtue of paragraph 12 of the same section.

Any shipment by common carrier begins with the issuance of a bill of lading, which is both a receipt and a contract for carriage or delivery. It usually contains the following: Place and date of shipment, description of goods as to quantity, weights, dimensions, identity, marks, conditions, quantity and value, the names of the contracting parties, including the consignee, the route and destination, the freight rate or charges, and whatever other stipulations which the parties may agree upon and which are in accordance with law.

"Where a railroad accepts freight for interstate transportation, but issues no bill of lading to the shipper, the uniform bill of lading prescribed by the Interstate Commerce Commission will be implied as the contract of shipper and carrier." *Western Maryland Rd. Co.* v. *Cross*, 96 W. Va., 666, 123 S. E., 572.

The bill of lading in the instant case is referred to as a "uniform straight bill of lading." It was addressed to the Southern Pacific Railroad Company at Modesto, California, on April 14, 1954, by California Frozen Foods, Inc. Under its terms the railroad company was to ship to Thomas Foods, Inc., Norwood Cold Storage Co., Norwood, Ohio, over the Southern Pacific, the Northern Pacific, the Chicago, Burlington & Quincy, and the Pennsylvania Railroad Company (the last named the

delivering carrier), 856 cases leaf spinach of 21,828 pounds, and 523 cases leaf spinach of 20,659 pounds. The first stop to complete loading was at Glacier Cold Storage Company, Arlington, Washington; there was to be standard refrigeration—coarse ice, 30% salt and fans to be kept in on position. It furthermore contained provisions with reference to the liability of the carrier; it was signed by California Frozen Foods, Inc., as shipper.

The plaintiff purchased spinach at Modesto, California, and peas at Arlington, Washington. When the spinach and peas were delivered to the railroad company they were in "merchantable condition," but when they were delivered by the defendant at Norwood, Ohio, they were in a "damaged and deteriorated condition." Plaintiff claimed damages of $4,742.83.

The defendant, in its answer, stated "that the instructions regarding refrigeration were properly carried out,—that there was no defect in the car or its equipment and that the said car moved on schedule—and, further, that if some of said goods were defrosted, damaged or in a deteriorated condition at destination it was through no fault or neglect of the carriers."

We are now faced with the problem of determining the liability of the carrier generally under the federal law and the liability of this defendant for the damage to the interstate shipment. Under the federal law, the carrier (any one of the carriers involved, including the delivering carrier) is liable for any loss or damage to the shipment through the fault of such carrier, regardless of any agreement affecting such liability. This liability is that of an ordinary bailee for hire (warehouseman). This relationship has been created by the terms of the bill of lading. Therefore, the carrier is bound to exercise ordinary care and is thus liable for ordinary negligence.

Quite generally, as long as it can be shown that the merchandise was in good condition when it was received by the carrier and in a damaged condition on delivery to the holder of the bill of lading, there is a prima facie case against the carrier. Now such was the situation in this case—the spinach and peas were in a good condition when they were received for shipment, and in a damaged condition when they were delivered to the consignee. Therefore, the burden of going forward rested on the

carrier defendant. To rebut this prima facie case against it, the defendant, in its brief, maintained that "the defendant appellant carrier offered uncontroverted evidence that the car was not defective and was properly constructed to hold perishable goods. It offered uncontradicted evidence that there was no delay by the carriers in handling the car and it offered uncontradicted evidence that the refrigeration of the car was in conformance with the instructions of the shipper."

These statements in this brief are based on the testimony of Hugh N. Winder, foreman of the mechanical department of the Pennsylvania Railroad Company, who testified that his work was "with the inspection and repair of freight cars"; that he had inspected PFE car 200670; that the car was built in 1954; that he "found the car in excellent condition"; that it "was only two months old" and that he "found no mechanical defects"; on the testimony of George Laing, who said he had been employed by the Pennsylvania Railroad Company for 42 years and that he was supervisor of freight services; that the movement of the car from Modesto, California, to Arlington, Washington, a distance of 1,000 miles, in four days "was a reasonable movement for this car at the time" and that the movement of the car from Auburn, Washinton, to Cincinnati, Ohio, was "a reasonable movement"; on the testimony of Clinton Vanniman, who testified that before his retirement he was employed by the Railroad Perishable Inspection Agency in Cincinnati, Ohio, and that he was so employed on April 28, 1954; that on April 28, 1954, he made a report on his inspection of PFE car 200670; that he "found the peas in 'A' end (opposite end to brake end) of car packed 12 two-and-a-half-pound packages per box, in firm, frozen condition, all layers and all rows; spinach in opposite end of car, side wall rows and upper layers frozen firm and packs shaky; from floor layer to sixth inner rows stock in thawing condition; temperature in these boxes shows 30 degrees"; that he took the temperature of the commodities and "found the peas top layer 16 degrees, center 23 and floor layer 22 degrees; spinach 22 top layer, center of car, outer rows 23 and lower layers, inner rows 30 degrees"; that he returned on April 29 to find that the car was empty and that the merchandise was in the Thomas Food, Inc., cooler; that his report on this merchandise

was as follows: "Spinach packages that are in original shape now opened and show ⅛ to ½ of solid ice at bottom and side of packs, and peas: all packages opened show sheet of ice at bottom of packs but are in firm solid frozen condition and good green color"; and from the testimony of Wm. H. Houston, an employee of the Perishable Inspection Agency since 1927, whose duties were to inspect perishable produce for "quality, condition, damaged load and so on," who testified that Vanniman's report was correct.

This court finds from the evidence that the defendant complied with all the terms of the contract (bill of lading); that there was no defect in the car; that it moved on schedule; that the type of refrigeration desired by the shipper was provided; that the instructions, "standard refrigeration—coarse ice—30% salt," were complied with, in that item No. 25 of the Perishable Protective Tariff defines the term, "percentage of salt," thus: "The term percentage of salt means the ratio of salt to quantity of ice supplied in initial icing or re-icing" and in that to 50,066 pounds of ice there are added 15,020 pounds of salt, and in that 30% of 50,066 is 15,019.80; that in accordance with Rule 203 of Perishable Protective Freight Tariff No. 16, the instructions to "re-ice to capacity at all regular icing stations with coarse ice and 30% salt" were followed; that the ratio of the amount of salt to the amount of ice was correct; and that the defendant was not guilty of any negligence in the matter.

The judgment of the Court of Common Pleas is, therefore, reversed, and final judgment for the defendant railroad company will be entered in this court.

*Judgment reversed.*

MATTHEWS, P. J., and LONG, J., concur.